# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| v. | )    Criminal Action Number |
| | )    09-00139-01-CR-W-DGK |
| Robert E. Green, | ) |
| | ) |
|         Defendant. | ) |

## REPORT AND RECOMMENDATION

Pending before the Court are the DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENT AND REQUEST FOR HEARING (Doc. #48) filed on September 20, 2010, by defendant Robert Green ("Green"). On October 29, 2010, the undersigned held an evidentiary hearing on Green's motion. Green was present and represented by his counsel, David S. Bell. The government was represented by Assistant United States Attorney Michael Green. At the evidentiary hearing, the government called four witnesses, Officer Ricky Ropka, Sgt. Louis Perez and Officer Kevin Growney of the Kansas City, Missouri Police Department and Special Agent Leena Ramana of the FBI. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Def't. #1 | Google map of area |
| Gov't. #10 | Written *Miranda* waiver |
| Gov't. #11 | FBI 302 report |
| Def't. #7 | KCPD investigative report |
| Def't. #6 | Officer Dunert report |
| Gov't. #13 | Officer Growney report |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

**PROPOSED FINDINGS OF FACT**

1. On Saturday, March 28, 2009, Ricky Ropka and Kevin Growney were on patrol duty as police officers with the Kansas City Missouri Police Department. Tr. at 19-20, 101.

2. On that same date, Louis Perez was on duty as a sergeant with the Kansas City Missouri Police Department. Tr. at 87-88.

3. On that date, at approximately 9:00 a.m., Officer Ropka, Officer Growney, and Sgt. Perez separately heard a call over the police radio about a bank robbery at the Commerce Bank at 63rd Street and Brookside Plaza in Kansas City, Missouri. Tr. at 20-21, 88, 101-02.

4. Officer Ropka, Officer Growney, Sgt. Perez, as well as other law enforcement officers responded to the call and set up a perimeter around the area surrounding the bank. Tr. at 22, 88, 102.

5. The suspect was described as black male with facial hair, between the ages 30 and 40, with medium build, wearing a black raincoat, black baseball cap, blue jeans and white Nike tennis shoes. Tr. at 103.

6. The day was cloudy with occasional moderate to heavy rain. Tr. at 23, 105.

7. Officer Growney noted a African-American man walking in the area who was not wearing a coat, but whose clothes appeared to be fairly dry. Tr. at 23, 103.

8. The man was medium build, between 5' 10" and 5' 11", with a goatee, and wearing white Nike tennis shoes. Tr. at 99-100, 103-04.

9. Officer Growney asked the man to stop and he complied. Tr. at 104.

10. The man told Officer Growney that he was a personal trainer and was in the area looking for a trail to go running. Tr. at 24, 106.

11. Officer Growney asked the man basic identifying questions (name, address, birthday, etc.). Tr. at 24, 107.

12. The man identified himself as Green. Tr. at 107.

13. Officer Growney then went to his patrol car and requested a computer check on Green. Tr. at 24-25.

2

14. A computer check revealed two outstanding warrants for Green's arrest. Tr. at 107.

15. During that time, Officer Ropka kept watch over Green "to maintain him in that position to make sure he [didn't] leave." Tr. at 24-25.

16. After approximately five minutes, Officer Growney returned and informed Green of the outstanding warrants for his arrest. Tr. at 25.

17. Green was then placed under arrest and handcuffed. Tr. at 25, 46, 107-08.

18. Green's person was then searched to ensure that he was not carrying a weapon or contraband. Tr. at 25, 108.

19. Officer Growney's search of Green found a large amount of U.S. currency in Green's front pants pocket. Tr. at 25, 46, 108.

20. After Green had been stopped by Officer Growney, Sgt. Perez did an area canvas in the nearby area. Tr. at 90.

21. While making the canvas, the residents of a nearby house told Sgt. Perez that they had seen someone running along the side of their house at 6405 Wyandotte. Tr. at 90.

22. Sgt. Perez and another officer then investigated the area and noted a trash can next to the side of the house. Tr. at 91.

23. In the trash can, Sgt. Perez found a black rain jacket, black sweatshirt, black hat with a "KC" logo, and a Stanley box cutter. Tr. at 91.

24. The items were recovered by the law enforcement officers. Tr. at 91.

25. On March 28, 2009, Leena Ramana was employed as a special agent with the FBI assigned to the Violent Crimes Fugitive Task Force in Kansas City, Missouri. Tr. at 56-57.

26. On that date, Agent Ramana was assigned to go to the Kansas City Missouri Police Department to interview Green. Tr. at 57-58.

27. Agent Ramana, and Tammy Payne, a detective with the Kansas City Missouri Police Department, interviewed Green. Tr. at 58-59.

28. During the interview, Green was not in handcuffs and neither officer displayed a weapon. Tr. at 59.

29. Prior to being advised of his *Miranda* rights, the officers asked Green various identifying information such as name, date of birth, aliases, hair color, eye color, height, weight, Social Security number and current address. Tr. at 78.

30. After Agent Ramana advised Green of his *Miranda* rights by reading the waiver form out loud to Green, Green himself read out loud from the waiver form that he understood his rights, and then signed the waiver form indicating that he was willing to speak with the officers. Tr. at 60-63; Gov't Ex. 10.

31. Upon questioning from the officers, Green denied that he was under the influence of drugs or alcohol. Tr. at 63.

32. Green did state that he had not slept in the last 24 hours, but he appeared coherent to the officers and his answers to the officers' questions were responsive. Tr. at 63-65, 83.

33. During the course of the two-hour interview, Green made inculpatory statements. Gov't Ex. 11.

34. Green never requested the presence of an attorney and never asked that the interview be stopped until the conclusion of the two-hour interview. Tr. at 68, 84-85.

35. At the conclusion of the interview, the officers asked Green for consent to take a buccal swan for purposes of obtaining a DNA sample. Tr. at 65, 70-71.

36. Green refused consent. Tr. at 65, 71.

37. After Green was removed from the interview room and returned to his cell, Agent Ramana noticed that Green had left behind the Styrofoam cup that he had brought to the interview room in order to drink water during the interview. Tr. at 67, 70.

38. The officers recovered the cup and sent it to the Kansas City Crime Lab to see if there was recoverable DNA on the cup. Tr. at 67-68, 72.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Green argues that: (1) law enforcement officers did not have a valid basis for initially stopping Green; (2) the statements made by Green to law enforcement officers were not voluntary; and (3) the Styrofoam cup (and corresponding DNA evidence) was improperly gathered by law enforcement officers. The Court rejects each of the contentions raised by Green.

## A. The initial stop

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, the Constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. U. S.*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the initial issue in this case, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id*. at 30, 88 S.Ct. at 1884. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id*. at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional

analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The rights protected by the Fourth Amendment are implicated in this case by Officer Growney's decision to stop Green on March 28, 2009. However, the Court concludes that Officer Growney's actions did not violate the United States Constitution. At the time of the initial *Terry* stop, Officer Growney knew:

(1) Green was walking in the area of the recent bank robbery,

(2) Green matched many of components of the suspect description, and

(3) Green was walking outside on a cold, rainy day without a coat and yet appeared to be relatively dry.

Such articulable facts justified Officer Growney in at least initiating an investigative detention of Green.

During an investigative stop, officers should use the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention. *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005). In this instance, the Court concludes that the brief encounter whereby Officer Growney asked Green about his purpose for being out and obtaining Green's identifying information were reasonably necessary and minimally intrusive. Likewise, the fact that Green had to wait for approximately five minutes while Officer Growney ran his name through the computer – under the totality of the circumstances – did not elevate this investigative stop into an arrest. From that point forward in the encounter, the outstanding arrest warrants for Green justified both his arrest and the ensuing search of his person incident to arrest.

## B. Green's statements to law enforcement officers

The Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying voluntarily in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*U.S. v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467

7

U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1628. However, "[a] waiver of *Miranda* rights is invalid if, in the totality of the circumstances, the accused's will was overborne." *United States v. Holloway*, 128 F.3d 1254 (8th Cir.1997) (*citing United States v. Makes Room*, 49 F.3d 410, 414 (8th Cir.1995)); *see also United States v. Caldwell*, 954 F.2d 496, 505 (8th Cir.1992) (waiver of *Miranda* rights is determined under totality of the circumstances and in light of the entire course of police conduct).

In *United States v. Boyd*, 180 F.3d 967 (8th Cir.1999), the Eighth Circuit Court of Appeals explained how to determine whether a waiver of *Miranda* rights is valid:

> The determination of whether an accused has knowingly and voluntarily waived his *Miranda* rights depends on all the facts of each particular case. The circumstances include the background, experience, and conduct of the accused. The government has the

> burden of proving that the defendant voluntarily and knowingly waived his rights.

*Id*. at 977 (*internal citations omitted*); *see also United States v. Barahona*, 990 F.2d 412, 418 (8th Cir.1993) (government bears burden of proving by preponderance of evidence that defendant knowingly, voluntarily, and intelligently waived his rights).

Thus, an inquiry into whether a suspect's *Miranda* rights have been waived "has two distinct dimensions." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141. The Court has explained:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. at 421, 106 S.Ct. at 1141. The *Moran* court further noted that "[o]nly if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id*. (*quoting Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571 (1979)). These principles subsequently have been summarized by lower courts. For instance in *Holman v. Kemna*, 212 F.3d 413 (8th Cir.2000), the Eighth Circuit found:

> A waiver is voluntary if it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent if it has been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id*. at 420.

In reviewing the totality of the circumstances surrounding Green's statements to Special Agent Ramana, the Court concludes that Green voluntarily made the statements after a knowing and voluntary waiver of his *Miranda* rights. Indeed, the only evidence presented to the Court to even arguably suggest that Green's actions were not voluntary is his statement to officers that he had not slept for 24 hours. Certainly:

> sleeplessness, alcohol use and drug use are relevant to [the *Miranda*] analysis, but intoxication and fatigue do not automatically render a confession involuntary. Instead, the test is whether these mental impairments caused the defendant's will to be overborne.

*United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). In this case, the evidence establishes that – despite a lack of sleep – Green was cogent and alert and able to answer questions without difficulty. Whatever mental impairment Green might have experienced, there is no evidence to suggest his will was overborne. *Compare United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (Eighth Circuit upheld the conclusion that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his *Miranda* rights under the circumstances presented); *Gaddy*, 532 F.3d at 788 (Eighth Circuit upheld the conclusion that a suspect who had not slept the night before voluntarily waived his *Miranda* rights under the circumstances presented where the evidence showed that the defendant appeared "awake and coherent").

### C. Seizure and search of the styrofoam cup

Finally, with regard to the seizure and subsequent search of the Styrofoam cup, it is well-settled that Fourth Amendment protections extend only to those items in which the individual has both a subjective and objectively reasonable expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421 (1978). Moreover, "[a]bandoned property is outside the scope of fourth

amendment protection because its owner has forfeited any expectation of privacy in it." *United States v. Thomas*, 451 F.3d 543, 545 (8th Cir. 2006). *See also California v. Greenwood*, 486 U.S. 35, 39-41, 108 S.Ct. 1625, 1628-29 (1988) (defendants do not have a reasonable expectation of privacy "in the inculpatory items that they discarded"). The government argues that Green abandoned the Styrfoam cup and, thus, no Fourth Amendment issue is present.

The recent decision in *Parisi v. Artus*, 2010 WL 4961746, slip op. (E.D.N.Y. Dec. 1, 2010) is instructive. In *Parisi*, law enforcement officers arrested a suspect in his home. The suspect, in resisting arrest, kicked and punched the arresting officers. *Id*. at *1. Even after being restrained, the suspect continued spitting on the officers. *Id*. Eventually, the officers placed a blanket over the suspect's (now) bloody head. *Id*. Later, following the suspect being moved to a permanent cell, the blanket was found discarded in the police temporary holding area. *Id*. The police seized the blanket and obtained DNA samples from the blanket linking the suspect to criminal activity. *Id*.

Following his conviction, the suspect challenged the use of the DNA evidence taken from the blanket. The court rejected the challenge.

> [The suspect] has not, however, demonstrated a bona fide subjective expectation of privacy in the yellow blanket or the DNA he left on it. . . . The blood ended up on the blanket as a result of [the suspect's] own actions. The officers testified that [the suspect] was being abusive and started spitting at them, and it was necessary to cover his head with the blanket. The blanket was then found in or under the garbage in the holding room, and there is no evidence to suggest [the suspect] had any property or other interest at all in the blanket or his abandoned DNA sample . . . Therefore the Court does not credit [the suspect's] assertion that he had a subjective expectation of privacy in the blanket. Second, even if a subjective expectation of privacy existed, that expectation was not objectively reasonable. As for the blanket, a suspect arrested upon probable cause does not have a reasonable expectation of privacy

11

> in items discarded while in police custody, even if his DNA is later
> collected from them.

*Id.* at *6. *See also People v. Sterling*, 57 A.D.3d 1110, 1112, 869 N.Y.S.2d 288 (3d Dep't 2008) (finding no reasonable expectation of privacy in discarded milk carton); *Commonwealth v. Bly*, 448 Mass. 473, 862 N.E.2d 341, 356-57 (2007) (suspect connected to murder by DNA analysis of water bottle and cigarette butts he left behind after interview with police); *State v. Athan*, 160 Wash.2d 354, 158 P.3d 27, 37 (2007) (no constitutional violation where police addressed phony class-action mailing to suspect in cold rape case and obtained suspect's DNA from saliva on return envelope since the "analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment."); *People v. Ayler*, 2004 WL 2715317, at *4-5 (N.Y. Sup. Ct. Sep. 22, 2004) (finding no reasonable expectation of privacy in cigarette butts discarded in police interview room)[1]; *State v. Wickline*, 232 Neb. 329, 440 N.W.2d 249, 253 (1989) (police not required to obtain warrant to test cigarettes defendant left at police station because he "abandoned these items and sufficiently exposed them to the officer and the public to defeat his claim to fourth amendment protection"). *But see* Edward J. Imwinkelried, *DNA Typing: Emerging or Neglected Issues*, 76 WASH. L. REV. 413, 437 (2001) ("[D]epositing DNA in the ordinary course of life when drinking, sneezing, or shedding hair, dandruff, or other cells differs

---

[1] For example, *Ayler* involved a suspect in police custody who had smoked in the interview room; his DNA was later collected from the discarded cigarette butts, yielding a DNA match with semen recovered from sexual assault kits from three different victims. The court there held that "defendant could have no reasonable expectation of privacy in the ... interview room or in any items he discarded there," and further that it is "not reasonable to expect that garbage discarded in a police interview room would remain undisturbed out of respect for the privacy of the person who left it there." *Ayler*, op. at *5.

from placing papers in a container on the street to be collected as garbage. Depositing paper in the trash is generally a volitional act.... Leaving a trail of DNA, however, is not a conscious activity.").

Accordingly, it is

**RECOMMENDE**D that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENT AND REQUEST FOR HEARING (Doc. #48) filed on September 20, 2010, by defendant Green.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                */s/ John T. Maughmer*
                                               **JOHN T. MAUGHMER**
                                               **U. S. MAGISTRATE JUDGE**